[No. B044415. Second Dist., Div. Three. Feb. 22, 1990.]

COUNTY SANITATION DISTRICT NO. 2 OF LOS ANGELES COUNTY, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;

ATLANTIC RICHFIELD COMPANY, Real Party in Interest.

COUNSEL

Knapp, Marsh, Jones & Doran, Daniel V. Hyde and Janette Sarmiento for Petitioner.

No appearance for Respondent.

McClintock, Weston, Benshoof, Rochefort, Rubalcava & MacCuish, Susan J. Triplett, Todd O. Maiden and Sandra F. Elkin for Real Party in Interest.

OPINION

DANIELSON, J.—County Sanitation District No. 2 of Los Angeles County (the District) petitions for a writ of mandamus commanding the respondent court to vacate its order sustaining without leave to amend the demurrer of Atlantic Richfield Company (ARCO) to the second through sixth causes of action of the second amended complaint.

We deny the petition.[1]

[1] On September 13, 1989, the alternative writ was issued.

## ISSUES PRESENTED

The central issue presented by this proceeding in mandamus is whether the liability and obligation of ARCO to pay the required surcharge or user charge fee, based on its discharge of industrial wastewater into the District's wastewater collection and treatment system, is a statutory liability, subject to the three-year period of limitations prescribed by Code of Civil Procedure section 338, subdivision (a), or a liability and obligation founded upon a contract in writing, subject to the four-year period of limitations prescribed by section 337 of that code. We hold that the liability and obligation is one created by the District's Wastewater Ordinance, a statute, and thus is subject to the three-year period of limitations prescribed by section 338.

## PROCEDURAL STATEMENT

The action was filed on August 5, 1988. On April 14, 1989, the District filed a second amended complaint setting forth nine causes of action. The first cause of action was based on section 409 of the Wastewater Ordinance and sought recovery of surcharges for the three fiscal years, 1984-1985, 1985-1986, and 1986-1987, which became due and owing on August 15 of each year. The second through sixth causes of action, respectively, on the alternative theories of breach of written contract, indebitatus assumpsit, quantum meruit, open book account, and account stated, sought recovery of the same kind of surcharges but for the fiscal year 1983-1984, which became due and owing on August 15, 1984. A copy of ARCO's permit to discharge industrial wastewater was attached as exhibit A to the second amended complaint and incorporated by reference into paragraph 18 of the second cause of action only.

The second amended complaint pleaded causes of action seven through nine, respectively, for suppression of fact, intentional misrepresentation of fact, and negligent misrepresentation of fact. The thrust of these causes of action is that ARCO fraudulently failed to disclose the true quantity and quality of its wastewater discharges, and that the District did not discover such facts until May 1987, when it obtained the true results after compiling and analyzing its own tests.

On or about May 31, 1989, ARCO filed a demurrer to the second through ninth causes of action. ARCO again demurred to the second through sixth causes of action on the ground that they were barred by the applicable limitation period. It demurred to the seventh through ninth causes of action on the ground that the District had failed to allege sufficient facts to show any actual or justifiable reliance on the alleged representation or nondisclosure by ARCO.

On June 30, 1989, the court sustained without leave to amend the demurrer to the second through sixth causes of action on the ground they were barred by the applicable limitation period. The court, however, overruled the demurrer to the seventh through the ninth causes of action.

## FACTUAL STATEMENT

ARCO, which operates a refinery in Carson, California, discharges approximately 4.6 million gallons per day of its industrial wastewater into the District's wastewater collection and treatment system pursuant to a permit issued by the District. ARCO's original permit was issued on or about June 1, 1973; it has been followed by subsequent permits issued, respectively, on or about September 23, 1975, March 30, 1982, and February 23, 1987.

ARCO pays the District an annual surcharge based on its volume of discharge, chemical oxygen demand, suspended solids and peak flow. Such surcharges are assessed for each fiscal year, which runs from July 1 through June 30. Payment is due and owing on August 15 of each year.

As the court stated, in *In re Lorber Industries of California, Inc.* (9th Cir. 1982) 675 F.2d 1062, when reviewing this ordinance, the District "was formed under the authority of [the county sanitation district act,] California Health and Safety Code[2] §§ 4700-4858 . . . . Its primary functions are to construct, operate, and maintain trunk sewer lines and treatment facilities that collect, treat, and dispose of domestic and industrial wastewater. The District is empowered to condemn or purchase property, and it may finance acquisition and construction by issuing bonds. [§ 4746.] Current expenses of maintenance and operation may be financed by [the] issuance of negotiable promissory notes. [§ 4746.1.] It is also granted the power to levy and collect real property taxes to meet bond obligations, pay promissory notes, and defray operating expenses. [§ 4747.] The District is [also] empowered to adopt [certain] ordinances [the violation of which is a misdemeanor punishable by fines, imprisonment or both]. [§ 4766.] These ordinances may provide for the collection of rentals, fees, and service charges. In addition to the misdemeanor penalties, charges assessed can be enforced through levy of a lien against the property for which the charge is imposed. [§ 5473.5.]

"Prior to 1972 the District was financed through ad valorem property taxes. Each user of the system thus contributed to the District's expenses on the basis of the assessed valuation of the user's property. In addition, the District received federal grants available under section 201(g) of the Water

---

[2] All further section references are to the Health and Safety Code unless otherwise indicated.

Pollution Prevention and Control Act (the Clean Water Act), 33 U.S.C. § 1281(g).

"In 1972 the Clean Water Act was amended to condition the award of grants upon conformance with specified revenue collection procedures. See 33 U.S.C. § 1284(b)(1), *as amended by Clean Water Act Amendments* of 1980, Pub.L.No. 96-483, 94 Stat. 2360. The amendments required that grant applicants adopt an assessment scheme in which each nonresidential user of the system was required to pay charges proportionate to its use of the system. This requirement was imposed to reduce the inequity of requiring low volume dischargers to subsidize those industries which produce high volumes of wastewater. It was also assumed that a system of charges based on use would encourage more efficient management of waste and more conservative use of the system. S.Rep.No. 95-370, 95th Cong., 1st Sess., *reprinted in* [1977] U.S. Code Cong. & Ad.News, 4326, 4352.

"In response to these amendments, the District adopted Sections 409 and 410 of its *Wastewater Ordinance, An Ordinance Regulating Sewer Construction, Sewer Use and Industrial Wastewater Discharges* (April 1, 1972; as amended July 1, 1975) . . . . Under these sections nonresidential users of the system are assessed a surcharge. The charge is determined by an engineer's estimate, and takes into account the contribution to flow, chemical oxygen demand, and suspended solids." (*In re Lorber Industries of California, Inc., supra*, 675 F.2d 1062, 1063-1064; italics in original.)

The Wastewater Ordinance (Ordinance) was enacted by the Sanitation District of Los Angeles County in 1972, pursuant to the authority provided in the County Sanitation District Act, sections 4700 through 4859, and "exercises authority conferred by law including but not limited to . . . Sections 5400 through 5474 and . . . Government Code Sections 54725 through 54740." (Ord., § 100.) The purpose of the Ordinance "is to provide for the maximum possible beneficial public use of the District's facilities through adequate regulation of sewer construction, sewer use and industrial wastewater discharges, to provide for equitable distribution of the District's costs, and to provide procedures for complying with the requirements placed upon the Districts by other regulatory agencies." (Ord., § 101.)

Industrial wastewater discharges are covered in part IV of the Ordinance. Sections 401 and 402 of the Ordinance[3] set forth the procedures and require-

---

[3] Section 401 of the Ordinance provides: "No person shall discharge or cause to be discharged any industrial wastewaters directly or indirectly to sewerage facilities owned by the Districts without first obtaining a Districts' Permit for Industrial Wastewater Discharge. . . .

ments for obtaining a permit. Sections 403, 404, and 405 of the Ordinance,[4] respectively, authorize the District to change or modify the conditions of a permit "from time to time as circumstances may require" or to require the discharger to apply for a new permit, to suspend a permit for up to 45 days, and to revoke a permit following a noticed hearing if any Ordinance provisions are violated.

"The Permit for Industrial Wastewater Discharge may require . . . payment of additional charges to defray increased costs of the Districts created by the wastewater discharge and such other conditions as may be required to effectuate the purpose of this Ordinance.

"No Districts' Permit for Industrial Wastewater Discharge is transferable without the prior written consent of the Chief Engineer.

"No person shall discharge industrial wastewaters in excess of the quantity or quality information stated in the Permit for Industrial Wastewater Discharge. . . ."

Section 402 of the Ordinance provides: "Applicants for a Permit for Industrial Wastewater Discharge shall complete a Districts' application form . . . .

"Upon receipt of all required information, the application shall be processed and, upon approval, be signed by representatives of both the local sewering agency and the Districts, and one copy returned to the applicant. When properly signed, the application form together with any documents attached thereto shall constitute a valid Permit for Industrial Wastewater Discharge.

"The application shall be approved if the applicant has complied with all applicable requirements of this Ordinance and furnished to the Districts all requested information and if the Chief Engineer determines that there is adequate capacity in the Districts' facilities to convey, treat and dispose of the wastewaters."

[4] Section 403 of the Ordinance provides: "The Districts may upon reasonable notice to the discharger change or modify the restrictions or conditions of a permit . . . from time to time as circumstances may require. Alternatively, the Districts may require the discharger to apply for a new permit. . . ."

Section 404 of the Ordinance provides: "The Chief Engineer may suspend a Permit . . . for a period of not to exceed 45 days when such suspension is necessary in order to stop a discharge which presents an imminent hazard to the public health, safety or welfare, or to the local environment or to the Districts' sewerage system.

". . . . . . . . . . . . . . .

"Any suspended discharger may file with the Chief Engineer a request for a Board hearing. Such a request shall not stay the suspension. . . . [W]ithin 14 days of the receipt by the Chief Engineer of such request, [the District Board shall] hold a hearing on the suspension and shall either confirm or revoke the action of the Chief Engineer. . . .

". . . . . . . . . . . . . . .

"The Chief Engineer shall reinstate the Industrial Wastewater Discharge Permit upon proof of satisfactory compliance with all discharge requirements of the Districts.

"The Districts' legal counsel may upon recommendation of the Chief Engineer commence and prosecute such legal action as may be appropriate to enforce the provisions of this Section."

Section 405 of the Ordinance provides: "The [District Board] may revoke a Permit . . . upon a finding that the discharger has violated any provision of this Ordinance. No revocation shall be ordered until a hearing on the question has been held by the Board [District Board]. . . .

"Any discharger whose . . . Permit has been revoked shall immediately cease and desist all discharge of any liquid carried wastes covered by the Permit . . . .

"Before any further discharge of industrial wastewater may be made by the discharger, he must apply for a new Districts' Permit for Industrial Wastewater Discharge, pay all charges that would be required upon initial application together with all delinquent fees, charges and penalties and such other sums as the discharger may owe to the Districts. . . ."

Pursuant to section 409 of the Ordinance,[5] the discharger is required to pay the District a wastewater treatment surcharge to be determined in accordance with the discharger's contribution of flow, chemical oxygen demand, suspended solids and peak flow. Section 422 of the Ordinance,[6] however, vests the District's chief engineer with discretion to require the discharger to pay an annual wastewater treatment user charge in lieu of the surcharge under section 409.

A two-step process is involved in the calculation of the annual surcharges to be paid by industrial users. Initially, the industrial users calculate their own surcharges based on a formula set forth in section 409 and according to the rate schedule in section 410. In addition to this self-monitoring system, section 415[7] sets forth certain procedures which the District may employ to determine discrepancies between actual and reported discharges, and authorizes the District to require the discharger to apply for an amended permit and to pay interest and penalties in addition to the charges for the discrepancies.

---

[5]Section 409 of the Ordinance provides: "Each industrial discharger shall, in accordance with Section 214, pay to the Districts a wastewater treatment surcharge. The wastewater treatment surcharge shall be determined in accordance with each such discharger's contribution of flow, chemical oxygen demand, suspended solids and peak flow. The treatment surcharge shall be based on the appropriate Districts' sewerage systems' maintenance, operation and capital expenditures for providing wastewater collection, treatment and disposal services as described in Section 410."

[6]Section 422 of the Ordinance provides: ". . . [Where] the Chief Engineer has determined that the difficulty of complying with Sections 411 and 414 is disproportionate to the anticipated revenue to be derived therefrom [similarly situated industrial discharges, such] industrial dischargers may, at the discretion of the Chief Engineer, be required to annually pay a wastewater treatment user charge in lieu of the wastewater treatment surcharge provided for by Section 409. . . . Payment of a wastewater treatment surcharge, as described in Section 409 may, at the option of the Chief Engineer, be permitted as an alternative to payment of user charges, at the request of an affected industrial discharger."

[7]Section 415 of the Ordinance provides: "Should measurements or other investigations indicate that the . . . discharger is discharging a quantity of wastewater, . . . or other wastewater constituent or at a flow rate significantly in excess of that stated in the . . . Permit, the discharger shall be required to apply for an amended permit.

". . . . . . . . . . . . . . .

"If . . . the Chief Engineer is unable to resolve the discrepancy on the basis of available information, he may order that additional information be obtained by Districts' employees through tests, flow measurements and wastewater sampling and analyses. All costs of additional flow measurements, wastewater sampling and analyses performed by the Districts shall be paid for by the discharger.

"The Chief Engineer shall then make a determination of the amount of any wastewater treatment and disposal charges due to the Districts, together with any interest and penalty charges due, and shall notify the discharger of the total charges due. The discharger shall pay such amounts within 45 days after service of written notice. . . .

"The discharger may, within 12 months after payment of these charges, submit a request for a refund together with appropriate supporting data. The Districts will consider this request and if a refund is due it shall be granted."

In 1986, the District began challenging the methodology utilized by ARCO to collect its wastewater field samples. The District alleges, in the second amended complaint, that if ARCO had used another methodology, which involved agitation of the samples, ARCO would have had to pay the District additional surcharges for the fiscal years 1983-1984 through 1986-1987. The District informed ARCO of its above conclusion in February 1988.

## CONTENTIONS

The District contends that the four-year limitation period of Code of Civil Procedure section 337, applies on the theory that ARCO's obligation to pay the surcharge arises from a contract, i.e., the permit. ARCO, on the other hand, asserts that its obligation arises from the Ordinance, and thus is subject to the three-year limitation period of section 338. We conclude that ARCO's position is correct.

## DISCUSSION

The thrust of the District's position is that ARCO's obligation to pay the surcharges is grounded in contract, because section 4742.1[8] expressly authorizes the District to enter into contracts for the use of its facilities and the permit issued to ARCO constitutes such a contract.

Based on our review of the applicable statutes, case authority and the permits themselves, we conclude the District's contentions are untenable.

### Nature of Obligation to Pay Surcharges

An obligation is "a liability created by statute" within the meaning of Code of Civil Procedure section 338, "[w]here a statutory scheme has been adopted that gives rise to newly created rights" (*Winick Corp.* v. *General Ins. Co.* (1986) 187 Cal.App.3d 142, 145 [231 Cal.Rptr. 606]), if the liability was created by law in the absence of an agreement (*Gardner* v. *Basich Bros. Construction Co.* (1955) 44 Cal.2d 191, 194 [281 P.2d 521]), or

---

[8]Section 4742.1 provides: *"Contract for use of district facilities; duration*

"It may contract with any district, city, governmental agency, or person, for the handling, treatment or disposal by the district of refuse, sewage, or industrial wastes originating within the district or county or within areas outside of the district or county when, in the judgment of the district board, it is for the best interest of the district to do so, upon such terms and conditions as may be agreed upon; provided, that the contract shall be for such term as agreed upon, but in no event for a term in excess of 50 years, or for such time as in the judgment of the district board the district shall have the capacity for handling, treatment or disposal of such refuse, sewage, or industrial wastes."

if the duty is fixed by the statute itself (*Travelers Express Co. Inc.* v. *Cory* (9th Cir. 1981) 664 F.2d 763).

■ An ordinance has the same force within its jurisdictional limits as a statute passed by the Legislature has throughout the state. (See *Ex Parte Roach* (1894) 104 Cal. 272, 274 [37 P. 1044]; *Evola* v. *Wendt Construction Co.* (1959) 170 Cal.App.2d 21, 24 [338 P.2d 498].) Therefore, an action upon a liability created by ordinance must be commenced within the three-year period prescribed by Code of Civil Procedure section 338. The rules applicable to construction of statutes apply equally to ordinances. (See, e.g., *City of Los Angeles* v. *Los Olivos Mobile Home Park* (1989) 213 Cal.App.3d 1427, 1433 [262 Cal.Rptr. 446].)

A. *Obligation to Pay Surcharges is a Statutory Liability*

■ From our recital of the pertinent provisions of the Ordinance, *ante*, it is clear that the District's right to collect surcharges from ARCO arises solely from the Ordinance itself. (See Ord., §§ 214, 409, 410.) Specifically, we point out that section 401 of the Ordinance expressly provides: "No person shall discharge or cause to be discharged any industrial wastewaters directly or indirectly to sewerage facilities owned by the Districts without first obtaining a Districts' Permit for Industrial Wastewater." In order to obtain such permit the discharger must comply with the application requirements and procedures set forth in section 401 and 402 of the Ordinance. Once the permit is obtained and the discharger utilizes the Districts' system, the discharger is obligated under section 409 to pay a wastewater treatment surcharge in accordance with section 214 of the Ordinance.[9] Section 409 sets forth a complicated formula for computing the surcharge while the unit charge rates for such surcharges are established pursuant to the procedure in section 410 of the Ordinance. Section 411 of the Ordinance

---

[9] Section 214 of the Ordinance provides: "Wastewater treatment surcharges shall be determined in accordance with Section 409 by self monitoring procedures performed by the industrial discharger pursuant to Section 414 and reported to the Districts as required by Section 411. . . .

"Except as hereinafter provided, commencing with the fiscal year beginning July 1, 1981 each industrial discharger shall pay to the Districts quarterly estimated surcharge payments. Such payments shall be due and payable on September 30, December 31, March 31, and August 15 of each year. . . . The payment due August 15 shall equal the total wastewater treatment surcharge due for the preceding fiscal year less the sum of the prepayments due September 30, December 31, and March 31. In the event that the estimated payments exceed the annual wastewater treatment surcharge due, the balance shall be refunded.

". . . . . . . . . . . . . . . . .

"A basic penalty charge of 10 percent of the original unpaid amount shall be added to any fee or charge or wastewater surcharge that becomes delinquent. Interest at the maximum rate provided by law shall accrue on the total of all delinquent fees, charges or wastewater surcharges plus all penalty charges."

imposes the duty on the discharger to file an annual statement regarding such surcharges and sets forth the content and time requirements for such statements.

The District concedes that prior to the enactment of the Ordinance it was "not under any obligation to accept *industrial* wastes into [its] system." Accordingly, since there was no common law duty on the part of the District to take industrial waste, a fortiori, there was no common law duty on the part of the discharger to pay a surcharge for industrial waste discharges.

Based on the foregoing, we hold that the duty of an industrial waste discharger to pay surcharges to the District for the use of the latter's system to dispose of industrial waste is an obligation created by statute. (See, e.g., *Winick Corp.* v. *General Ins. Co., supra*, 187 Cal.App.3d 142, 145; *Aubry* v. *Goldhor* (1988) 201 Cal.App.3d 399, 404 [247 Cal.Rptr. 205].)

B. *The Permit Issued to ARCO Is Not a Contract*

■ We find that the permit issued by the District to ARCO, permitting ARCO to dispose of its industrial wastewater in the District's system, is not a contract and was not issued pursuant to section 4742.1.

In support of its position the District relies primarily on the fact that in obtaining a permit the applicant agrees in writing that "IN CONSIDERATION OF THE GRANTING OF THIS PERMIT [, it will] pay to the Sanitation District annually the required surcharge or user charge fee for industrial wastewater treatment."

We recognize that such condition, inter alia, is part of the permit issued to the industrial discharger. However, that condition does not transform the discharger's obligation to pay the surcharge from a statutory obligation into a contractual obligation. Under section 409 of the Ordinance, the discharger is already obligated to pay the surcharge. The fact that the permit recites that the discharger agrees to undertake such obligation adds nothing and, instead, simply constitutes notice to the discharger of its already existing statutory obligation.

The District also relies on the following language, quoted from *In re Lorber Industries of California, Inc., supra*, 675 F.2d 1062, 1067: "These charges are fees for services provided to the industrial users of the system. The specific services, processing and disposal of excess wastewater, are provided to industrial users, rather than to the general local population. Amounts specifically charged for those services are by nature a debt obliga-

tion, based on a contractual agreement, the application for and issuance of a permit. The source of the obligation is not the authorizing legislation, but Lorber's decisions to acquire a permit and to engage in a high level of system use."

We find that reliance to be misplaced. The issue in *Lorber* was whether the surcharges were of the nature of "debts," without priority, or "taxes," and thus, entitled to priority, in bankruptcy. The above language, that the charges were based on a contractual agreement, was not necessary for determination of that issue. It is, therefore, simply dicta, which must be disregarded.

Moreover, the *Lorber* court failed to set forth any analysis to support its bare conclusion that the surcharges are "a debt obligation, based on a contractual agreement, the application for and issuance of a permit." (675 F.2d 1062, 1067.) We therefore decline to adopt the foregoing conclusions of the *Lorber* case.

Although we acknowledge the right of the District to enter into contracts for the use of its systems pursuant to section 4742.1, it is clear that the surcharges at issue in this case are not an obligation imposed by contract.

A review of the permit itself shows that it was not issued pursuant to section 4742.1. Instead, it expressly states that it was issued under the Ordinance.

Finally, we point out the inherently inconsistent position of the District with respect to its first cause of action under section 409 of the Ordinance as contrasted to its second through sixth causes of action, based on breach of written contract and common count theories. This is not an instance of pleading alternative legal theories, e.g., negligent or intentional misrepresentation. Instead, it is a case of apples and oranges, i.e., a statutory obligation or a contractual obligation. The subject matter of all of the causes of action is the same, i.e., recovery of industrial waste surcharges. Either such surcharges are statutory obligations or they are contractual in nature; they cannot be both. It is obvious that the reason the District is pursuing the theory of contract liability as to the second through sixth causes of action for the surcharges owed for 1983-1984 is to avoid the three-year bar of Code of Civil Procedure, section 338, which applies to statutory obligations.

## DECISION

The petition for a writ of mandamus is denied. The alternative writ, having served its purpose is discharged.

Klein, P. J., and Arabian, J., concurred.

Petitioner's application for review by the Supreme Court was denied May 17, 1990. Arabian, J., did not participate therein.